Miller's Administrator *v.* Miller.

MILLER'S ADMINISTRATOR *vs.* MILLER and others.

1. An administrator is entitled to enforce specific performance of a contract made with his intestate for the purchase of real estate.

2. Want of capacity, as a defence to the enforcement of the contract, should be distinctly set up in the answer.

3. A contract for the sale of real estate works an equitable conversion of the land into personalty from the time when it was made, and the purchase money becomes, thereupon, a part of the vendor's personal estate, and, as such, distributable, upon his death, to his widow and next of kin.

4. In equity, on the execution of a contract for the sale of real estate, the vendor becomes trustee of the property for the purchaser, and upon his death intestate, his heir-at-law becomes such trustee in his stead. Judgments against the heir-at-law are not liens upon the property.

5. To a bill by an administrator to compel specific performance of a contract made with his intestate, for the purchase of real estate, it was objected that the administrator was not properly before the court to entitle him to a decree ; that there were judgments against the heir-at-law ; that the intestate's widow would not release her dower ; that the contract provided for opening roads through the property ; and that the administrator was in laches in filing the bill. *Held*—

1. The judgments against the heir wers not liens upon the property.

2. The widow did not appear to have been requested to release her dower, but appeared to have been willing to do so, provided the purchase money were paid to the administrator ; and the administrator, by the bill, tendered a release of the dower, on the purchaser's performance of agreement.

3. The heir-at-law could have opened the roads provided for in the contract.

4. The lapse of two and a-half months after taking out letters of administration, which was on the day when the deed was to be delivered, before filing the bill, does not deprive complainant of the right to bring this suit.

Miller's Administrator *v.* Miller.

6. When a contract which should be enforced contains inequitable provisions, equity will decree performance of it, only upon such terms and with such restrictions, as to secure equity in the premises.

7. Time, in this case, is not of the essence of the contract.

8. Specific directions by the court, as to the carrying out of the agreement; the terms of the mortgage to be given for the purchase money; and the disposition of the purchase money and securities.

Bill for specific performance. On final hearing on pleadings and proofs.

*Mr. Vanatta,* for complainant.

*Mr. Pitney,* for David L. Miller.

*Mr. F. G. Burnham,* for Hoyt, Reddish, and Ohlen.

THE CHANCELLOR.

On the 10th of June, 1872, John B. Miller, now deceased, being the owner in fee of a tract of land of forty-nine acres and twenty-four hundredths of an acre, situated in the township of Chatham, in the county of Morris, in this state, entered into an agreement with Jehiel K. Hoyt for the sale of those premises to the latter, for the price of $39,392. The agreement was in writing, and was signed by both parties. By it, Miller, for the consideration of that sum, agreed with Hoyt that he would well and sufficiently convey the land to Hoyt, his heirs and assigns, or to such person or persons as Hoyt might designate, on or before the first day of September then next, by a full covenant warranty deed, free and clear from all encumbrances, and that he would open a new road, sixty feet in width, on or before the 2d day of the last mentioned month, from the upper Madison road to a new road then lately laid out through the property. On his part, Hoyt covenanted with Miller to pay, or cause to be paid to the latter, his heirs or assigns, the consideration money as follows: $100 on the execution of the agreement; and, on the day of the execution and delivery of the deed of conveyance, the

further sum of $4900 ; and that, on the last named day, he, or the person or persons to whom the deed of conveyance should be delivered, should execute and deliver to Miller his or their bond and mortgage upon the premises, to secure the sum of $34,392, the residue of the purchase money, which sum, secured by the bond and mortgage, should be payable at the termination of seven years from the date of the bond and mortgage, the interest to be payable annually, and to begin to run six months after the date of the delivery of the deed of conveyance. It was also thereby agreed that the bond should contain the usual sixty days interest clause, and that the mortgage should contain an agreement whereby Miller, his executors, administrators, or assigns should release to Hoyt, his heirs, executors, administrators or assigns, any portion of the premises, on the payment to Miller of such sum as should be equivalent to the rate of $800 per acre for such part to be released, and that such sum so paid should there-upon be endorsed on the bond as a payment on account thereof. On or about the 20th of August, 1872, it was agreed between Miller and Hoyt, that the time for the delivery of the deed should be extended to the first day of October then following. Before the last mentioned day, Miller died. The deed had not yet been delivered. Miller died intestate, leaving a widow and one child, the defendant, David L. Miller, his sole heir-at-law. John B. Miller, on the 25th of April, 1872, had made an agreement, in writing, with Hoyt, by which, for the consideration of one dollar, he agreed to sell the premises in question to Hoyt, or to such company of indi-viduals as might be named by him, on his or their paying to Miller the further sum of $100, and agreeing to buy the property ; notice of intention to close the sale to be given to him before the 1st of June then next. The general terms of the sale were to be, $800 per acre, of which $5000 were to be paid in cash, and the residue to be secured by bond and mortgage on the property, payable in five years ; interest to commence six months from the execution of the bond and mortgage. Miller thereby agreed that, on fulfillment of the

proper stipulations, he would give a good and valid warranty deed for the property. He also agreed to open a road between the house then occupied by David Miller and his, John B. Miller's, barn, extending to the land in question, and not less than three rods wide. This was the preliminary agreement between Miller and Hoyt. On the 28th of May, 1872, Hoyt entered into an agreement with Henry E. Reddish, Henry C. Ohlen, and Charles T. B. Keep, by which, among other things, he and they assumed the last mentioned agreement between Miller and Hoyt, and it was agreed that it should enure to their benefit, and its covenants and liabilities be performed by them, as far as they were to be performed by Hoyt; and also, that when the title to the land should be acquired thereunder, such title should be vested in Reddish and Ohlen, as joint tenants, and not as tenants in common, and that they should hold the same for the purposes named in the agreement between them and Hoyt and Keep. On or about the 23d of September, 1872, after the death of John B. Miller, Hoyt wrote to David L. Miller, declaring his readiness to fulfill the contract of June 10th, 1872, between Hoyt and John B. Miller, and notifying David L. Miller, as sole heir-at-law of the latter, that he looked to him for the fulfillment of that contract on his part, and that on the first day of October then next, he would request him, and he thereby then requested him to deliver, on the last mentioned day, a deed for the premises, according to the contract. By the letter, he designated Reddish and Ohlen as the persons to whom the conveyance should be made. On the 1st of October, 1872, Reddish and Ohlen made a tender to David L. Miller of the money which, by the contract of June 10th, 1872, for the sale of the land, was to be paid on the delivery of the deed, and they tendered also the bond and mortgage which were to be delivered for the residue of the purchase money. David L. Miller then offered to convey the property to them on the receipt of the money and the bond and mortgage, and tendered a warranty deed for the property, with the usual full covenants, executed by himself and wife, and duly

acknowledged. They, however, refused to receive the deed, and pay the money and deliver the bond and mortgage, unless Miller would deliver to them, at the same time, a duly executed release of the dower of the widow of John B. Miller, and would cause to be canceled of record certain judgments of large amount in the aggregate, which were of record against him. So far as the judgments were concerned, he offered to indemnify them out of the money which was to be paid by them, which was sufficient for the purpose. They refused, however, notwithstanding his offer, to accept the deed and pay the money and deliver the bond and mortgage, because of the want of the release above mentioned.

On the 1st of October, 1872, letters of administration of the goods, chattels, and credits of John B. Miller, deceased, were issued to the complainant by the surrogate of Morris county, and on the 20th of December following, the complainant filed his bill in this court against David L. Miller and his wife, Hoyt, Reddish, Ohlen, and Keep, and the widow of John B. Miller, deceased, and the judgment creditors of David L. Miller, praying that the agreement of June 10th, 1872, between his intestate and Hoyt, may be specifically performed, and particularly that it may be decreed that David L. Miller is seized of the legal title to the land as trustee of and for Hoyt or his appointees, and is bound to and do convey the legal title to the land, with the appurtenances, to Hoyt or his appointees, upon his or their paying and securing the purchase money to the complainant, as administrator, pursuant to the agreement, and that the land may be conveyed, free and clear of all encumbrances, real or apparent, made, caused, or suffered, by David L. Miller; and that it may be decreed that the wife of David L. Miller is not entitled to any dower, or right of dower, inchoate or otherwise, in the land, and that the land be conveyed by David L. Miller, and held by the purchaser or purchasers forever thereafter, free and clear of any dower, or right of dower, inchoate or otherwise, of the wife of David L. Miller; and that Hoyt, Reddish, Ohlen, and Keep may be decreed and required to perform that agreement in all

things thereby, by the purchaser or purchasers, to be performed, and particularly that they, or some of them, may be required to pay and secure to the complainant, as administrator, the purchase money mentioned in the agreement, according to the terms of the agreement, on the complainant's delivering, or procuring to be delivered to them, a release of the dower of the widow of John B. Miller in the land; and also that the rights of the widow in and to the purchase money may be ascertained, and the time and manner of paying to her what may be due to her in that respect, may be ordered and decreed; and that the judgments against David L. Miller and every of them, may be declared and decreed to be no liens or lien on the land, and that the land be conveyed by David L. Miller to the purchaser or purchasers, free and clear of the judgments, and of every of them, and that the purchase money may be decreed to be personal assets of the estate of John B. Miller, deceased, and, as such, payable to, and receivable by, the complainant, as administrator.

After the filing of the bill the widow died, and administration of her estate was, on the 29th day of January, 1873, granted to Keep and his wife, the latter being her daughter by a former husband. On the 13th of December, 1872, before the filing of the bill, the widow, by a letter addressed by her to the complainant as administrator, referring to the agreement of June 10th, 1872, stated that she had expected to join with her husband in the conveyance of the land so as to release to the purchaser her right of dower therein, and that she was still ready to do what and all she could to perform that agreement, and was ready to deliver to any person or persons who might become the purchaser or purchasers of the land, under and pursuant to the agreement, a release duly executed, of her dower and right of dower in and to the land, provided the purchase money be paid and secured, (so far as time was given on any part of it for payment,) to the complainant, as administrator of John B. Miller, deceased. She further thereby declares her willingness to take for her interest in the land, or for her share of the purchase money,

such share or portion thereof as the courts in this state should adjudge to be her right. And in consideration of the premises she thereby offered to and agreed with the complainant, that if he would, by judicial proceedings or otherwise, cause or procure the agreement to be specifically performed, and the purchase money to be paid and secured to be paid to him as administrator, she would, whenever the purchase money should be so paid and secured, at his request, deliver to the purchaser or purchasers receiving the conveyance, a full release of her dower and right of dower in the land; she declaring herself willing to receive from the complainant, as administrator, such portion of the purchase money as should be adjudged to belong to her. She added that she was not willing, and did not consent, that the purchase money should be received by or for David L. Miller, as heir of John B. Miller, deceased, or otherwise.

David L. Miller, Keep and his wife, as administrators, and Hoyt, Reddish, and Ohlen answered the bill. Miller, by his answer, admits that the land descended to him as sole heir-at-law of his father, subject to the dower of the widow therein, and that she was entitled to a distributive share of the personal estate of his father. He states that he declared himself ready to convey the premises in question according to the agreement of June 10th, 1872, provided he were satisfied of the existence and validity of that agreement, and that he tendered a deed for the property to the attorney of Reddish and Ohlen, on the 1st of October, 1872, and that it was refused only on the ground that the widow's dower had not been released. He alleges that the personal estate of his father was ample for the payment of all his debts, and he denies that under the circumstances, the complainant, as administrator, is entitled to receive the purchase money of the land, on sale thereof under the agreement, and he claims that the land is his individual property, by descent from his father, and is not subject to any trust. He alleges that the agreement was obtained from his father by Keep, through Hoyt, in the interest of his mother-in-law,

the widow, in order by that means to convert the property into personalty, with a view to her obtaining a distributive share thereof, accordingly, as personal property, on the death of his father, who was then very old and infirm; that Keep obtained the extension of the time for carrying out the contract to the 1st of October, 1872, and that on that day there was, in fact, no one ready to take the property under the agreement, but that the tender was a mere pretence. He alleges besides, that Keep arranged with Hoyt that the widow should absent herself on the 1st of October, so that she might not be in the way of executing a release of her dower and that so the tender might be made with safety, and that she did so absent herself on that day, accordingly; and he alleges that by such conduct she forfeited, abandoned or waived all right, if she ever had any, to have the land decreed to be personalty, or to any part of the proceeds of the sale of the property, if the contract should be established and specifically performed. He further alleges that the proceedings in this suit are really carried on in the interest of the personal representatives of the widow, and that they were in fact instituted by her, or in her behalf. The answer alleges laches on the part of the complainant and the widow in filing the bill for specific performance, and alleges that if John B. Miller entered into the contract in question, and did indeed extend the time for the performance of it, he was induced to do so at a time when his mind was in an enfeebled condition, against his own better judgment and will, by the over persuasion and undue influence, fraud, and contrivance of his wife and Keep, and without understanding that the result of the contract might be to increase the share which his wife would have in his estate at his death.

Hoyt, Reddish, and Ohlen, by their answer, admit the agreement of June 10th, 1872, and their liability to take the property thereunder, and allege that they were ready to do so on the first of October, 1872, and that their tender was bona fide. They allege that the widow, in order to hinder and delay them, and to prevent the fulfillment of the terms

of the contract, designedly, on the 1st of October, 1872, departed from her residence in the village of Madison, contiguous to the dwelling-house of David L. Miller, and immediately left this state, and continued to absent herself from her residence and from this state for a long time thereafter, and thereupon neglected and refused to release her dower in the property; and they charge and insist that she, by her conduct in this respect, caused them great vexation and put them to large pecuniary charges and loss. The answer further alleges that the time for the fulfillment of the contract was an exceedingly important element therein, and that by reason of the non-performance of the agreement by David L. Miller and the widow, Hoyt, Reddish, and Olden have been put to heavy expense and great loss and damage; that, relying on the agreement, and supposing that it would be carried into effect by John B. Miller, or his representatives, they spent large sums of money in laying a public road and opening the same up to the premises, and they hoped by such expenditures and improvements to immediately sell a considerable portion of the land to be conveyed to them by John B. Miller or his representatives, under the agreement, and thus reap a large pecuniary profit therefrom, but that the conduct and refusal of the widow, and the neglect of the heir-at-law, prevented them from obtaining a good title to the premises, and from improving and selling the land during the fall of 1872, and that the time for such sale had, when the bill was filed, December 20th, 1872, gone by. They further allege that the agreement to open the road was a vital part and condition of the contract, and that the road has not been opened, and that this fact further diminishes the value of the premises.

The complainant is properly before the court, seeking as administrator, to compel specific performance of the contract of June 10th, 1872, between his intestate and Hoyt. That contract was valid when it was made, and was so still when John B. Miller died. Though the answer of the heir-at-law sets up fraud and undue influence on the part of Keep and John B. Miller's wife, alleging that they induced Miller to

enter into it, with the sinister design on their part of obtaining by that means, for the wife, through the equitable conversion which might result from the contract, a larger portion of the estate of John B. Miller, at his death, than she otherwise would have been entitled to, yet there is no proof whatever to sustain the charge. On the other hand, the evidence shows that when the contract was made, John B. Miller was not only capable of making it, but possessed sagacity and shrewdness, and acted independently. He employed John W. Hancock, the surveyor, to make a survey and map of the property, after the preliminary agreement of the 25th of April, 1872, had been made. He was with the surveyor part of the time, at least, while the survey was in progress. The surveyor testifies that he thinks that Miller told him for what purpose he wanted the survey and map made, and adds, that he thinks he told him that he had had a proposal to sell the property to some parties. He says his impression is, he made the map in part for Mr. Burnham, who was attorney for the purchaser, to examine the title by; that Mr. Miller gave him what information he had about it; that after he prepared the map, he took it, on the 5th of June, 1872, to Mr. Burnham's office, to Mr. Burnham, and that Mr. Miller went with him there. While there, the witness made a memorandum of the particulars of the bargain, and says he understood, on that occasion, that those particulars were to be in the agreement which Mr. Burnham was to draw. When inquired of as to his reason for noting those particulars in his memorandum, he answered that he was acting as an agent and friend of Mr. Miller in getting out the papers, and supposed that he made those notes for Mr. Miller's assistance and protection. He says Mr. Miller's health, at the time, was pretty good, and that he appeared well, and seemed to understand what he wanted. He says Mr. Miller's memory did not seem to be as tenacious as it had been formerly, and the witness was acting like a clerk, to help him keep the things connected. In answer to an

inquiry as to what he thought at the time, of the prudence of the agreement in providing for payment of only $100 in cash at the time of its execution, and the provision for release of any acre, without regard to its comparative value, on payment of $800, he says : " That matter was discussed between Mr. Miller and myself, and I didn't express any opinion to anybody but him, that I remember ; I don't know that I ought to answer any further.   I said to Mr. Miller that I didn't exactly approve of it ; I said to him that I thought it was risky ; I think Mr. Miller understood that Mr. Hoyt contemplated running a street through this property and selling lots off.   My talk with Mr. Miller went further than the releasing the lots ; I think I told Mr. Miller that he didn't receive money enough, to begin with, to make it sure and safe to him ; that the value of the trade would turn with him upon the amount of payments which he received ; that he might have to let the thing go as some other property had that he and I knew of, and have to buy it back again ; I think Mr. Miller agreed with me in that, and remarked to me that if they paid him the interest, he would have more money than they had."   The witness says he does not know what Mr. Miller understood about the arrangement ; that the title was to be taken by some man to be named by Hoyt, and not by Hoyt himself ; but that Mr. Miller said to him that " Mr. Burnham was cashier, but that he did not know who stood behind it."   This witness was, at the time when he testified, over sixty-seven years of age, and he says he had known John B. Miller all his life.   He was, therefore, capable of judging as to the capacity of the latter to transact business.   Mr. Burnham, attorney of Hoyt, testifies that he thought Miller understood himself very well, as regarded the business in hand ; that he was vigorous in mind and body. David L. Miller, on his cross-examination, admits that, even as late as August, 1872, his father would talk intelligently to any one who came to him on business, and that, even when he was confined to his bed, as he was then, part of the time, he was intelligent.   There is no proof of want of capacity,

and, indeed, want of capacity is not distinctly set up in David L. Miller's answer. Though, on the hearing, it was insisted on behalf of David L. Miller, that the contract was an improvident one, yet this defence is not set up in his answer. For obvious reasons, he should have set it up there, if he expected to rely upon it as a defence. The evidence of improvidence is, it is insisted, to be found in the agreement for release of any acre of the land, on receipt of $800. Whether this was an improvident bargain or not, must depend on the value of the land. That Mr. Miller considered the property well sold, is evidenced by his remark to Hancock, above quoted, when the latter spoke to him of this feature of the contract. The contract was a valid one, and it worked an equitable conversion of the land into personalty from the time when it was made. See the cases cited in the notes to *Fletcher* v. *Ashburner*, 1 *W. & T. Lead. Ca. in Eq.* 546, [659]; *Smith* v. *Hubbard*, 2 *Dick.* 730; *Story's Eq. Jur.*, § 790; *Champion* v. *Brown*, 6 *Johns. C. R.* 398; *Mulford* v. *Hiers*, 2 *Beas.* 1; *King* v. *Ruckman*, 6 *C. E. Green* 599. And on the principle of equitable conversion, the purchase money became a part of John B. Miller's personal estate, and, as such, was distributable to his widow and next of kin. *Bubb's Case, Freem., Ch. R.* 41; *Baden* v. *Countess of Pembroke*, 2 *Vern.* 215; *Hawley* v. *James*, 5 *Paige* 323, 456; *Drenkle's Estate*, 3 *Barr* 377; 1 *Sugd. Ven.* (*8th Am. ed.*) 287. In *Lawes* v. *Bennet*, 1 *Cox* 167, it was held that, where an estate is contracted to be sold, it is, in equity, considered as converted into personalty from the time of the contract, and that this notional conversion takes place, although the election to purchase rests merely with the purchaser. See also *Ripley* v. *Waterworth*, 7 *Ves.* 425, 437; *Townley* v. *Bedwell*, 14 *Ves.* 591; *Daniels* v. *Davison*, 16 *Ves.* 249; *Collingwood* v. *Row*, 3 *Jur. N. S.* 785; *Goold* v. *Teague*, 5 *Jur. N. S.* 116; *Farrar* v. *Earl of Winterton*, 5 *Bear.* 1. And in *Curre* v. *Bowyer*, reported in a note to *Farrar* v. *Earl of Winterton*, it was held that, where the contract is binding at the death of the vendor, although the purchaser by subsequent laches loses

his right to a specific performance, yet the estate will belong to the next of kin, and not to the heir-at-law. In *Att'y Gen.* v. *Day*, 1 *Ves., Sen.,* 220, it was held, however, that such conversion will not take place where the court holds that the contract cannot, or ought not to, be performed. This contract is not within either of those exceptions. It can, and ought to, be performed. As the case stood at the filing of the bill, a complete title could have been made to the purchasers. The judgments against David L. Miller would have been decreed to be no liens upon the property, for, in equity, on the execution of the contract, John B. Miller became trustee of the property for the purchasers, and, at his death, David L. Miller became such trustee in his stead. The complainant, by the bill, tendered a release of the widow's dower, on the performance of the agreement, and David L. Miller could have opened the road provided for in the contract.

But, it is urged on behalf of David L. Miller, that the court ought not to decree performance, because the agreement for a release of the property, on the payment of $800 per acre, is inequitable; and he and the purchasers object also to such decree, because the widow, as they allege, by her conduct after the death of John B. Miller, and before the filing of the bill, precluded herself from the benefit of the contract. The purchasers further object, because of laches on the part of complainant. No objection is made by the purchasers that, if a conveyance be decreed, the deed to be made by the heir-at-law cannot be a compliance with the agreement, so far as the covenants stipulated for are concerned; nor is any question raised on that score, or on the ground of any uncertainty as to the road. As to the first of these objections: As already remarked, it does not appear that the provision for release, on payment at the rate of $800 per acre, is inequitable; and, if it were, this court would not decree performance of it, except on such terms and with such restrictions as to secure equity in the premises. *Emmons* v. *Hinderer*, 9 *C. E. Green* 39; *Ensign* v. *Colburn*, 11 *Paige* 503. The second objection is not sustained by the evidence. The widow does not appear to

have refused to release her dower; indeed, she does not appear to have ever been requested to do so. David L. Miller did not ask her to release, nor did the purchasers. It is alleged that, on the morning of the 1st of October, 1872, she left her residence in Madison, in order to avoid an application for a release, but David L. Miller neither made nor sent to her any request to release; and, although one of the purchasers, Mr. Reddish, with Mr. Burnham, left Madison in the same railroad car with her, they neither of them said anything to her on the subject, although Mr. Reddish had an interview with her in the car. If it be admitted that the witness, Mary F. Young, refers to this occasion, she contradicts the statement of the answer of Hoyt, Reddish, and Ohlen, that the widow left this state, for she says she went to Orange. It does not appear from the testimony of this witness, that, on the occasion to which she refers, the widow remained away from her home for more than the day; and, indeed, the testimony of this witness is by no means sufficient to induce the conclusion that the widow was at any time unwilling to release her dower, in order to prevent the performance of the contract. It is not to be forgotten in this connection, that it appears by the evidence of Mr. Burnham, that he had notice on the afternoon of the 1st of October, 1872, that the widow was willing to release her dower on such a payment as would secure her rights.

It remains to consider the last objection. There is nothing in the terms of the contract itself, in the nature of the property, or of the attendant circumstances, which would make it inequitable for this court to interfere, and decree performance of this contract, although the heir-at-law was, on the first day of October, 1872, unable fully to perform the contract. It seems evident, from the testimony, that the purchasers, when that demand was made, did not expect performance. It would, perhaps, not be too much to say, that they did not desire it. They expected that the heir-at-law would not be able to give them a title free of the widow's dower. Had they desired performance, they would probably have taken

some steps to ascertain, at least, whether she would be willing to release. Yet, although, as before mentioned, Messrs. Reddish and Burnham saw her in the railroad car, and the former had an interview with her there, immediately after his interview that morning with David L. Miller, in which Messrs. Reddish and Ohlen made the tender, and demanded performance, and Miller, with their consent, deferred his reply until the afternoon of that day, yet neither Burnham nor Reddish appears to have made any reference to the subject. If, as Mr. Reddish testifies, he and his associates were very anxious that the agreement should be performed on the first day of October, when they made the tender, it seems strange that they should not even have inquired of the widow, on that day, as to her willingness to release her dower, and that they took no action whatever, upon the assurance given to Mr. Burnham by the complainant's solicitor on the 1st of October, that the widow was ready to sign a release on such payment being made as would secure her rights. Besides, it is in evidence that Mr. Burnham, the attorney for the purchasers, subsequently to the 1st day of October, 1872, and after the demand made upon David L. Miller in the afternoon of that day, in answer to something said to him by the solicitor of the complainant on the subject of time, said that he did not think there was any necessity for immediate haste. Mr. Burnham acted for the purchasers from the beginning, and was their agent in the matter. It was he to whom John B. Miller applied for an extension, and it was by him that the desired extension was accorded. His acts and declarations in the matter were binding on the purchasers. I see nothing in the answer or evidence, to lead me to conclude that the delay in filing the bill from the 1st of October to the 20th of December following, should bar the complainant from a decree for performance of the contract. He is entitled to a decree accordingly.

There will be a decree, therefore, that David L. Miller convey, in fee simple, to Reddish and Ohlen, the premises in question, and that he open (that is, lay out to public use,) the road

provided for in the contract, according to the agreement. Miller's wife will be decreed to be entitled to no dower in the property. Hoyt, Reddish, and Ohlen will be decreed to pay to the complainant the purchase money remaining unpaid, that is to say, the sum of $4900, with interest thereon from the filing of the bill, December 20th, 1872, and to execute and deliver to the complainant their bond for the residue of the purchase money, $34,392, payable on the 20th of December, 1879, seven years from the date of the filing of the bill, with interest from June 20th, 1874, payable annually, with provision that if any payment of interest shall be in arrear and unpaid for sixty days after the day on which it shall become due, the whole of the principal shall, at the option of the obligee and mortgagee, or his legal representatives, be at once due and payable; the payment of the bond to be secured by their mortgage upon the premises, to be duly executed and acknowledged and delivered by them; and that Hoyt, Reddish, and Ohlen pay to the complainant interest on the sum of $34,392, from June 20th, 1873, six months from the time of filing the bill, to the 20th day of June, 1874. The money and securities which shall thus come to the hands of the complainant, are to be administered by him in a due course of administration, and the administrators of the widow will be entitled to receive from him the amount of her distributive share thereof. The complainant is entitled to costs as against all the defendants, except the administrators of the widow.